Anthony V. Thomas v. Commissioner. Estate of Joseph M. Thomas, Deceased, Anthony V. Thomas, Administrator v. Commissioner. George J. Thomas v. Commissioner.
Thomas v. Commissioner
Docket Nos. 34101, 34102, 34268, 34269.
United States Tax Court
1953 Tax Ct. Memo LEXIS 74; 12 T.C.M. (CCH) 1243; T.C.M. (RIA) 53347; October 30, 1953
Everett H. Davidson, Esq., and O. D. Eshelman, Esq., for the petitioners. James F. Kennedy, Jr., Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent determined the following *75 deficiencies in the petitioners' income tax: Docket No.
Year
Deficiency
Anthony V. Thomas
34101
1947
$ 2,342.63
1948
24,283.21
1949
10,833.95
Estate of Joseph M.
Thomas
34102
1946
6,475.81
1947
9,467.95
1948
11,278.69
1/1-9/17/49
13,361.96
George J. Thomas
34268
1946
4,823.20
1947
2,407.35
1949
4,166.39
34269
1948
24,179.41
The issues presented for determination are the correctness of the respondent's action in determining (1) that the available books and records did not clearly reflect the individual incomes of Anthony V. Thomas, Joseph M. Thomas and George J. Thomas for the years 1946 through 1949 and that their incomes for those years should be determined on the basis of their increases in net worth plus living expenses and other amounts for such years; (2) the amount of cash on hand at the end of the respective years owned in equal shares by Anthony V. Thomas, Joseph M. Thomas and George J. Thomas; (3) that a property known as Broadway Recreation and the cash proceeds and a mortgage received on the sale thereof were assets owned jointly by Anthony V. Thomas and George J. Thomas; (4) that a three-fourths *76 interest in a property designated 333 Georgia Avenue was an asset owned jointly by Anthony V. Thomas, Joseph M. Thomas and George J. Thomas; (5) that a mortgage indebtedness owing by Willard Zimmerman was owned solely by Joseph M. Thomas; (6) the amounts of living expenses of Anthony V. Thomas, Joseph M. Thomas and George J. Thomas for the years in controversy; (7) that income taxes paid by Anthony V. Thomas, Joseph M. Thomas and George J. Thomas during the years in question should be included in their respective incomes for the years in which payments were made; (8) that amounts taken as deductions on the income tax returns of Joseph M. Thomas for 1947 and 1948 were to be treated as part of his income for the respective years; (9) that the unallowable portion of a deduction taken as a medical expense by Joseph M. Thomas for 1948 was to be treated as a part of his income for that year; (10) that Joseph M. Thomas incurred extraordinary expenses during 1949 in the amount of $5,000 which was to be treated as part of his income for that year; (11) that Anthony V. Thomas, Joseph M. Thomas and George J. Thomas each received a dividend of $2,375 in 1947 from Thomas Properties, Inc.; (12) *77 that the period of limitations for assessment of tax for 1946 against the estate of Joseph M. Thomas has not expired; and (13) that in the computation of the tax liability of George J. Thomas for 1948 the benefit of split income was not to be allowed. General Findings of Fact A portion of the facts have been stipulated and are found accordingly. Anthony V. Thomas, Joseph M. Thomas and George J. Thomas, sometimes hereinafter referred to as the petitioners, were brothers. Joseph M. Thomas died on September 17, 1949, aboard the steamship "Noronic," which was destroyed by fire in Toronto, Canada. Anthony V. Thomas was appointed, and is acting, as administrator of his estate. During the years involved herein, Anthony, George and Joseph, until his death, were residents of Lorain, Ohio, and their income tax returns for the years in controversy were filed with the collector for the 18th district of Ohio. The father and mother of the petitioners had six children, Nazera, Elias, Joseph, George, Anthony and Rose. The father of the petitioners died about 1924. At that time Nazera had married and was Mrs. Zegiob. Elias had been given money for his father and was attending college. Thereafter *78 Elias became a lawyer, practiced law in Lorain, and died in 1941 leaving his widow, Juanita, and their son surviving him. Prior to his death the father of the petitioners operated a store at 10th and Broadway, sometimes referred to as 1006 Broadway, in Lorain, Ohio, in which candy, fruit, cigars, magazines and newspapers were sold. Shortly before his death he told Joseph and George, who had been helping him at the store and who were about 19 and 17 years of age, respectively, that the money he had saved and would leave at his death was to be divided between them and Anthony, who then was about six or seven years old, since Elias had been given his share. The amount of money left by the father was small. After the death of petitioners' father, their mother continued the store business until her death in 1933. Joseph became the active manager of the business and early in 1924 quit school during his first year of high school. George, who, at least for a time, assisted in the store, later quit school after completing three and one-half years of high school. Anthony completed high school and three years of college before quitting college in June 1939. George worked 19 years as an operator *79 in motion picture theaters in Lorain and quit that work in 1945. Thereafter, beginning in 1947, he worked as an electrician for a electrical contractor and then, until the day preceding Joseph's death in September 1949, he worked for an electric company. After leaving college in June 1939 and prior to the end of 1941, Anthony worked for about a year at a steel plant in Lorain. From 1930 until about July 1936, Joseph, with same assistance from George and Anthony, conducted a business of selling sandwiches, ice cream and candy at 20th and Broadway in Lorain. Five or six girls were employed in the conduct of the business. At her death in 1933, the mother of the petitioners left an estate having a net value of $35,880.42 and consisting of various parcels or real estate. Her daughter, Nazera Zegiob, elected to take as her share of the estate a building which at one time belonged to her father and mother. The remaining parcels were transferred to Thomas Properties, Inc., a corporation formed about 1936 for the purpose of acquiring the properties. For their interest in the properties, the petitioners, their brother Elias, and their sister Rose each received one-fifth of its stock or 20 *80 shares. The corporation has continued in existence and following the death of Elias in 1941 the petitioners and their sister Rose acquired for cash equal portions of the 20 shares previously owned by him, thus making each of them the owner of 25 shares. At the time Thomas Properties, Inc., acquired the above-mentioned properties some of them were encumbered by a mortgage and some were in need of repair. It was also considered desirable to improve one of them, a building situated at 333 Broadway in Lorain. Accordingly, a mortgage loan was obtained in an amount sufficient to pay off the existing mortgage and make the needed repairs and desired improvements. The sandwich, ice cream and candy business conducted at 20th and Broadway until about July 1936 was discontinued at that location because the space occupied by it was taken over for the use of a moving picture theater. During the first part of 1937, a tenant in the building at 1942 Broadway, owned by Thomas Properties, Inc., and next door to the building at 20th and Broadway, moved out. Following certain remodeling and redecorating of the vacated building, Joseph, George and Anthony opened business there in May 1937 under the *81 name of Thomas Grill. They continued to operate the business there throughout the taxable years involved herein. About five to seven persons were employed in the operation of the grill which sold food, soft drinks, beer and liquor. At the time the Thomas Grill was opened in 1937, two items needed for the operation of that business were purchased on a chattel mortgage basis from the National Cash Register Company. One of the mortgage debts was for $425 and the other for $360. Payments thereon extended to approximately August 30, 1939, when the mortgages were cancelled. Four other chattel mortgages were outstanding against Joseph or George during the same period. In addition a soda fountain which cost $2,000, or slightly more, was purchased on a non-interest bearing, chattel mortgage basis from an ice cream company from which Joseph had previously purchased ice cream. At some undisclosed time prior to 1939, probably about 1936, Elias took over the building and the store business conducted at 10th and Broadway with the view of conducting his law practice at that location and his wife, Juanita, conducting the store business theretofore carried on there. The store business was not very *82 successful and when Elias became bedridden at, or shortly after, the time Anthony left college in 1939 and Juanita was no longer able to devote her time to the business, Anthony took it over from her. In December 1939 he gave her a chattel mortgage for $1,850 to secure payment for the furniture and equipment which she had put in and which he had purchased from her. Thereafter he paid the mortgage which was cancelled in October 1940. In 1942 a bar located at 333 Broadway in Lorain, and sometimes hereinafter referred to as the 333 Bar, was purchased by Joseph, George and Anthony at a cost of $5,500. That amount was for the business, the license and the inventory of merchandise. The bar was, and continued to be throughout the years involved herein, operated as a workingman's drinking place at which liquor, beer and sandwiches were sold. Anthony became manager of the bar when it was purchased. In the summer of 1943, Joseph, acting on behalf of himself, his sister, Nazera Zegiob, and Edward Sable, arranged to purchase for $90,000 a property situated in Lorain known as the Broadway Building. The transaction was handled under an escrow arrangement whereby a down payment or deposit of *83 $10,000 in cash was furnished by Joseph. The transaction was closed on August 21, 1943, at which time Joseph paid $20,000 in cash, which was the remainder of his one-third share of the purchase price. On that date deed to the property was executed by the seller and a mortgage executed on it by the purchasers with respect to Nazera Zegiob's and Sable's shares of the purchase price. On July 13, 1943 and August 21, 1943, withdrawals of $10,000 and $20,000 were made from the account of the Thomas Grill at Central Bank in Lorain. Joseph continued to own his interest in the property until his death. At some undisclosed time prior to May 31, 1945, Joseph opened an account with a stock brokerage firm which he continued until his death. The credit cash balance in the account at the close of 1945 was $6,310.65. At some undisclosed time prior to December 31, 1943, he opened another account with the same firm which he also continued until his death. The credit cash balances in the account at the close of the years 1943, 1944 and 1945 were $408.21, $9,784.49 and $20,399.44, respectively. In June 1943 Central Bank arranged for a loan of $8,000 by Joseph to Niel and Dorothy Gilbert. The loan *84 was made in cash which was furnished by Joseph. From the time of the opening of the Thomas Grill in 1937 until during 1942 the petitioners kept there only the food, beer, liquor and other supplies used in the operation of that business. After the purchase of the 333 Bar in 1942 not only were the foregoing items used by Thomas Grill kept there, but all of the liquor, most of the beer, and all of the other supplies for the 333 Bar were kept there and moved to the 333 Bar as needed. The most liquor the petitioners ever had was in 1942 and 1943. For the purpose of the additional Federal tax imposed on liquor stocks on hand on November 1, 1942, Joseph filed a return showing 22.445 proof gallons, or about 10 cases, of liquor at the 333 Bar on that date and another return showing 42.94 proof gallons, or about 19 cases, of liquor at the Thomas Grill on that date. Upon investigation, a representative of the Bureau of Internal Revenue found that the amount reported at the 333 Bar was understated by 86.3 proof gallons, or by about 21 cases, and that the amount reported at the Thomas Grill was understated by 211 proof gallons, or by about 100 cases. As a result of the investigation, Joseph *85 filed a supplemental return in 1943 with respect to the liquor stock at the Thomas Grill, paid additional tax and penalties of approximately $420 and submitted an offer of $1,750 in compromise of criminal and civil liabilities. In 1943, he also filed a supplemental return with respect to the liquor stock at the 333 Bar, paid additional tax and penalties of approximately $173 and submitted an offer of $700 in compromise of criminal and civil liabilities. In 1938 Joseph rented a safe deposit box at the Central Bank in Lorain and continued to hold it until his death. During the years 1939 to 1943 Central Bank at the request of Joseph gave him two $500 bills for bills of smaller denominations. During a year or two prior to 1943 Anthony, at the direction of Joseph, exchanged bills of smaller denominations at the Lorain Branch of the Cleveland Trust Company for two or three $1,000 bills. The records of the collector at Cleveland, Ohio, relating to the income taxes paid by individuals prior to 1939 are not available. The following is a statement of the taxable net incomes reported by the petitioners and the taxes thereon for the years 1939 through 1945: Joseph
George
Anthony
Year
Income
Tax paid
Income
Tax paid
Income
Tax paid
1939
$ 2,663.06
$ 55.87
(a)
(a)
1940
5,121.45
181.75
(a)
(a)
1941
6,298.49
698.05
(a)
$ 1,030.83
$ 23.96
1942
6,963.61
1,437.30
$ 1,976.92
$ 10.00
5,142.56
636.21
1943
13,197.18
1,463.21
9,671.18
162.65
12,324.67
560.96
1944
13,595.85
4,264.10
7,993.73
1,583.18
8,691.72
2,270.93
1945
15,844.92
5,352.46
6,064.90
1,023.82
10,317.98
2,872.65
Total
$63,684.56
$25,706.73
$37,507.76
(a) No return filed.
*86 Issue 1. Determination of income by increases in net worth Findings of Fact During 1946 through 1949 the petitioners continued to operate the 333 Bar and the Thomas Grill. As in prior years Joseph did all the purchasing, including liquor, had charge of all the records and data used in keeping the books, and looked after and directed the preparation of income tax returns for the businesses and for himself, George and Anthony. In addition, he had charge not only of his money but also most of that of George and Anthony. The petitioners maintained safes at the 333 Bar and at the Thomas Grill for the safekeeping of money on hand. About 1945 or 1946 they purchased two time clock safes for that purpose and placed one in the Bar and the other in the Grill. When Anthony and George needed money of a substantial amount, they asked Joseph for it. On occasions Anthony took the money he needed without asking Joseph. In 1946 Anthony purchased a Cadillac automobile for $3,300. This was his first automobile and was purchased with money which he had obtained upon a request to Joseph. In 1947 he sold the automobile and in 1949 purchased a Buick from funds obtained from the sale of the Cadillac. *87 For some time Anthony had been interested in the purchase of a boat. In the spring of 1949 he found in Florida the type of boat he desired, an Owens cruiser, and purchased it for $12,000, which he paid in cash. The cash used in the purchase was taken from the safe in the Grill and carried to Anthony in Florida by George who made the trip overnight by airplane. In 1947, 1948 and 1949 Central Bank arranged for a number of loans by Joseph, or by Joseph, George and Anthony, to third parties and also handled collections on other loans by one or more of them. Actual cash, totaling approximately $56,200, was used in making four loans in 1948. On November 30, 1949, Anthony, as administrator of Joseph's estate, and Reno Collier, deputy auditor of the State of Ohio, opened Joseph's safe deposit box at Central Bank. The box was found to contain $180,479 in cash. Of that amount, $25,479 was deposited in the Citizens Home Savings Association, $25,000 was deposited in the Lorain Banking Company, and the balance of $130,000 was used to purchase United States Government securities at the Central Bank. The $130,000, consisting of 775 $100 bills, 47 $500 bills, and 29 $1,000 bills, thereafter was *88 transferred to the Federal Reserve Bank in Cleveland. So far as appears, no data were retained by which the dates of printing and original issuance in circulation of the bills deposited in Citizens Home Savngs Association and Lorain Banking Company can now be determined. Nor are the dates of printing and original issuance in circulation of the bills comprising the $130,000 disclosed. Memoranda made by the Federal Reserve Bank respecting the $500 and $1,000 bills transferred to it show that a portion of the $500 bills were released by it to its branches over the years 1940 through 1944 and that the $1,000 bills were released by it to its branches over the years 1938 through 1944. However, the time when the branches released them into circulation is not known. The records maintained by Central Bank as to Joseph's entries to his safe deposit box show that he entered it the following number of times during the indicated years: Times
Year
entered
1938
2
1939
2
1940
7
1941
1
1942
1
1943
9
1944
5
1945
4
1946
2
1947
4
1948
4
1949
2
The entires in 1946 were made in March and December. Those in 1947 were made in February, May and July. Those in *89 1949 were made on March 16 and April 8. In the returns filed by Joseph for the purpose of assessment of Ohio personal property taxes for 1946 and 1947, no amount was reported as undeposited cash on hand or in safe deposit box or elsewhere on January 1st of the respective years. In his returns for 1948 and 1949, the amounts of $550 and $500, respectively, were reported with respect to such property on January 1st of such years. After the $180,479 of cash had been found in Joseph's safe deposit box, Harold B. Herron, a representative of the Ohio Tax Commissioner, made an investigation to determine whether, or to what extent, the cash should be subjected to Ohio personal property taxes. At the beginning of the investigation, he made inquiry of Anthony as to what he knew about the money found in the box. Anthony informed him that he knew nothing about the amount prior to the time the box was opened following the death of Joseph and the money was counted. After a discussion of the matter with Anthony and his attorney, it was agreed that Joseph's liability for personal property taxes on account of the money should be determined on the basis that the safe deposit box contained the following *90 sums of cash on the indicated dates: January 1, 1946
$ 15,813
January 1, 1947
36,897
January 1, 1948
57,981
January 1, 1949
115,365
Determinations of Joseph's personal property tax liabilities were made accordingly. As a result of the determinations for 1946 and 1947, a penalty of 50 per cent of the additional tax for those years became due. Anthony, as administrator, filed a petition for the reduction of the penalty, and, as a basis for the petition, stated that Joseph had been putting into the safe deposit box money which had been taken from the business, and that the accountant who prepared the property tax returns knew nothing about it. The income tax returns for the petitioners for 1946 were prepared by the accounting firm of Bernstein and Bernstein. The books of the petitioners for that and prior years were destroyed in 1947 by a fire in a building in which Joseph had placed them. During 1947, 1948 and 1949 Davidson Audit Company kept certain books for the 333 Bar and the Thomas Grill. The entries made in such books, except those relating to matters transpiring after the death of Joseph, were made from data supplied by Joseph. The entries made therein *91 with respect to the total purchases and expenses of the two businesses were accurately entered from the data submitted, which included cancelled checks, check stubs, bank statements and petty cash items. The entries made with respect to the receipts by the businesses were made from slips on which were listed the purported summaries of the daily receipts. Davidson Audit Company did not verify the accuracy of the amounts appearing on the slips, nor did it verify the amounts of opening and closing inventories furnished by Joseph. No ledger, as such, was maintained nor were any ledger accounts kept with respect to any assets or any liabilities. So far as shown, no records were maintained with respect to the cash in the safe deposit box or other cash on hand at any given time, except petty cash and the amounts in the cash registers. Separate books and records were kept by the partnership, consisting of Joseph, Nazera Zegiob and Edward Sable, which owned the Broadway Building. No formal books were kept with respect to the loans made by Joseph. However, he kept a card index which contained sufficient information to identify the debtor, the date of the loan and the amount thereof. Davidson *92 Audit Company prepared partnership returns for 1947, 1948 and 1949 for the 333 Bar, and for 1947 and 1949 for Thomas Grill. These returns accurately summarized and reflected the entires made by Davidson Audit Company in the books which it kept with respect to those businesses. The partnership returns filed for the 333 Bar for the years 1946, 1947 and 1948 showed Joseph and Anthony as the partners with distributive shares of 20 per cent and 80 per cent, respectively. The partnership returns filed for Thomas Grill for 1946 and 1947 showed Joseph and George as the partners with distributive shares of 60 per cent and 40 per cent, respectively. During 1948 George was having marital trouble and in that year he filed a suit for divorce. In view of this and of certain threats made by his wife, he concealed his connection with the business enterprises conducted by him and his brothers. Thereafter, so far as the records maintained by them showed, he had no interest in any of the enterprises. No partnership return was filed for Thomas Grill for 1948. Only Joseph reported income from that business for that year, even though George continued to own an interest in the business. George knew that *93 by not reporting any income from the Grill for 1948 he substantially understated his income for that year. The partnership returns filed for 333 Bar for 1947, 1948 and 1949, and for Thomas Grill for 1947 and 1949 accurately reflect the summaries of purchases, expenses and receipts entered in the books kept by Davidson Audit Company for those businesses for such years. One-third of the indicated partnership profits recorded in the books of the partnership owning the Broadway Building for the years 1946, 1947, 1948 and 1949 were reported on the individual income tax return of Joseph for said years. All of the interest earned in 1947 and 1948 on loans identified in net worth computations made by the respondent was reported on the returns filed by Joseph for such years and the interest earned by those loans in 1949 was reported equally on the returns of Joseph, George and Anthony for that year. All cash dividends paid on stock listed in net worth computations made by respondent for the years in issue were reported on the individual income tax returns of Joseph, George andanthony for the respective years. Immediately following the opening of Joseph's safe deposit box and the finding *94 that it contained $180,479 in cash, Anthony took the position that one-half of the money was his and one-half was Joseph's. Subsequently, Anthony changed his position and he and George took the position that they each owned one-third of the money. During the course of the administration of Joseph's estate the question of the ownership of the money, the 333 Bar, the Thomas Grill, and certain loans made by Joseph was litigated and Joseph, George and Anthony were adjudged the owners of one-third interests therein. Upon a consideration of the method in which the petitioners had operated and had reported income, in the light of the foregoing adjudication and finding upon investigation that during 1948 the expenditures, investments and bank deposits made by petitioners greatly exceeded the incomes reported by them for that year and also exceeded their incomes from disclosed sources, and further finding that no record had been maintained with respect to undeposited cash on hand which was part of the stock in trade of their loan business, the respondent concluded that the petitioners' books and records did not correctly reflect their incomes for the years 1946 through 1949 and determined *95 their income for the years in controversy on the basis of their increase in net worth, plus living expenses and other items of expenditures for said years. Opinion The respondent has determined that the books and records maintained by the petitioners for the years involved herein did not correctly reflect their incomes and has determined their incomes for such years on the basis of their increase in net worth, plus living expenses and other items. His action is presumed to be correct and must be sustained unless it is shown to be erroneous. The record shows that during his lifetime Joseph had charge of all the records and data used in keeping the books and had looked after and directed the preparation of the income tax returns for the 333 Bar and the Thomas Grill and for himself, George and Anthony. Joseph died leaving in excess of $180,000 in cash in his safe deposit box. The books and records maintained failed to disclose the existence of the cash, its origin, its ownership, or the time or times when it was placed in the box. Joseph did not, in his returns for Ohio property tax purposes for the years 1946 and 1947, report any amount as undeposited cash on hand, or in safe *96 deposit box, or elsewhere on January 1st of those years. In such returns for 1948 and 1949, he reported $550only and $500, respectively, as representing undeposited cash. When questioned by Herron, a representative of the Ohio Tax Commissioner, about the money, Anthony disclaimed any knowledge as to the amount of money contained in the box until it was counted after the box was opened following the death of Joseph. However, for the purpose of securing a reduction of a 50 per cent penalty imposed as a result of additional Ohio property tax assessed for 1946 and 1947 with respect to the money, Anthony stated in a petition that Joseph had been putting into the box money which had been taken from the business. Further, Anthony took conflicting positions as to the ownership of the money. At first he claimed that he owned one-half of it and Joseph the other half. Subsequently, he and George claimed that they each owned one-third and Joseph one-third. A similar claim of ownership of one-third interests appears to have been made by them with respect to other properties, including the 333 Bar and the Thomas Grill. However, in the income tax returns filed by them and Joseph for prior years, *97 they either reported no income from one or more of the properties or reported incomes therefrom in proportions other than one-thirds. At the hearing in these proceedings the petitioners submitted the testimony of various persons who testified to having seen Joseph at different times prior to 1946 or 1947 when he had what appeared to be large sums of cash. In addition, George and Anthony testified to large sums of cash having been kept on hand. Anthony testified that in 1945, 1946 or 1947 cash on hand amounted to $230,000 or $240,000 of which about $60,000 was used to make loans. Anthony and George stated that in 1946 or 1947 they accompanied Joseph when $150,000 was placed in the safe deposit box, George stated that the same $150,000 was part of the sum found in the box following Joseph's death. Although bank accounts appear to have been maintained for the 333 Bar and the Thomas Grill, and personal bank accounts were maintained by Joseph, both George and Anthony testified that when Joseph was to be away for several days he took the cash on hand at the Bar and the Grill, except that required for operating business expenses, and placed it in his safe deposit box and that after he *98 returned he made withdrawals from the box. In this connection Anthony further testified that a day or two prior to the day when Joseph left on the five day trip during which he died on September 17, 1949, he went with Joseph to the box and Joseph placed the cash then on hand in the box. However, the records of the bank in which the box was situated show that the last time Joseph entered the box prior to his death was on April 8, 1949. After a careful consideration of the foregoing contradictory and conflicting situation in connection with the remainder of the record bearing on the question, we are unable to conclude that all, or even the greater portion, of the money found in Joseph's box after his death was, or represented, money accumulated by the petitioners prior to 1946 as they would have us believe. Furthermore, under the circumstances presented, we are unable to find that the respondent erred in determining that the books and records maintained by petitioners for the years in controversy did not correctly reflect their income and in further determining that the income of the petitioners was to be computed on the basis of their increases in net worth, plus other items for the *99 respective years. Issue 2. Determination of amount of cash on hand at the end of the years 1945 through 1949 Findings of Fact In determining the increases in net worth of the petitioners, the respondent first determined the net worth at the end of the years 1945, 1946, 1947, 1948, and 1949 of what is variously referred to in the record as the "pool," "joint pool," "partnership," and "three-way partnership," but which is hereafter referred to as the joint pool. Assets included in the joint pool were those which the respondent determined were jointly owned by petitioners, that is, in which the petitioners each owned a one-third interest, at the end of the respective years. One-third of the net worth of the joint pool at the end of the respective years was treated as an asset of each petitioner at the end of such years. In determining the net worth of the joint pool, the amounts used by respondent with respect to the petitioners' investment in 333 Bar and the Thomas Grill were taken from the books and records maintained by petitioners for such businesses. The amounts used with respect to loans or mortgages and notes receivable were obtained from Central Bank through which the loans *100 were either negotiated or which held them for collection purposes. The amounts used for cash on deposit in banks were taken from the records of the respective banks. In determining the net worth of the joint poll at the end of 1945, 1946, 1947, and 1948, the respondent used the following amounts as the joint pool's cash on hand at the end of the indicated years: $ 17,394
1945
40,587
1946
58,531
1947
115,865
1948
The amounts of $17,394 and $40,587 used by respondent for 1945 and 1946, respectively, represented the amounts of cash on hand on January 1, 1946, and 1947 as shown in supplemental returns filed by Anthony for Joseph for the purpose of Ohio property tax for 1946 and 1947 and included the amounts of $15,813 and $36,897, which had been agreed upon at the conference between Anthony and his attorney and Herron as the amounts of cash in Joseph's safe deposit box on January 1, 1946, and January 1, 1947, respectively. The amounts of $58,531 and $115,865 used for 1947 and 1948, respectively, represented the amounts used by Herron as Joseph's cash on hand on January 1, 1948, and 1949, in determining Joseph's liability for Ohio property tax for 1948 and 1949 *101 and included the amounts of $57,981 and $115,365, which had been agreed upon at the conference between Anthony and his attorney and Herron as the amounts of cash in Joseph's safe deposit box on January 1, 1948, and January 1, 1949, respectively. Opinion The petitioners contend that the amounts used by the respondent as the joint pool's cash on hand at the end of the respective years 1945 through 1948 represent amounts which were agreed upon merely as a bargain entered into between Anthony as administrator of Joseph's estate and Herron as a representative of the Ohio Tax Commissioner for the settlement of Joseph's liability for Ohio personal property taxes for the years 1946 through 1949, that said bargain or agreement was not based upon any determination of facts by Herron, and that, therefore, it would be error for us to sustain the respondent's use of the amounts in question. Herron was offered as a witness for the respondent and he testified at length as to the circumstances under which the agreement as to the amounts in controversy were arrived at. His testimony shows that, upon setting a date for a conference with Anthony's attorney, Everett H. Davidson, also counsel for *102 petitioners in these proceedings, he requested Davidson to assemble for the conference all the information he could obtain as to when the money found in Joseph's safe deposit box after his death might have been placed there; that at the conference Anthony informed him that he knew nothing about the amount of money until the box was opened and the money counted and that Davidson stated he did not have any knowledge of the money; that Davidson submitted three or four bank accounts as the only data he had and stated that he felt a good deal of the money had been put in the box during the last year for making a real estate deal; that after examination of the bank accounts and discussion of the matter with Davidson an agreement was reached that the amounts set out in our findings were the amounts of cash in the box on January 1 of the respective years. Obviously, Anthony and Davidson had full opportunity to present any and all the data that they had bearing on the amount of the cash in the box on January 1 of the various years involved. From such data as were presented, certain amounts were agreed on. These amounts were used in determining Joseph's liability for Ohio personal property taxes *103 for the various years. The respondent has used the same amounts in determining the net worth of the joint pool. From the record before us, we are unable to find that the amounts so agreed upon and used are erroneous or that other and different amounts more nearly approximate the amount of cash in Joseph's box on the critical dates. Consequently, the respondent's action on this issue is sustained. Issue 3. Ownership of Broadway Recreation Findings of Fact In 1945 George and Anthony began to operate a bowling alley, sometimes referred to as Broadway Recreation. The alley was situated in the Broadway Building. Each reported a loss from the operation in his income tax return for 1945. Each reported income from it in 1946. In their returns for 1947 each reported the sale of the alley in January of that year at a gain. One-half of the gain was reported by each as a longterm capital gain with the statement that each owned one-half of the property. In his returns for 1945 and 1946, Joseph did not report any loss or income from the operation of the alley, nor in his return for 1947 did he report any gain from the sale thereof. The property was sold to Elmer Wolfe who paid part cash and *104 gave a note secured by a mortgage on the property for the remainder of the purchase price. In 1949, and after Wolfe had made certain payments on the note, he decided to repair and improve the bowling alley. In that year Joseph, George and Anthony made a loan to him secured by a mortgage on the property. From the proceeds of that loan, Wolfe completed payment of the purchase price. In determining the net worth of George at the end of 1945 and 1946 and of Anthony at the end of 1946, the respondent treated Broadway Recreation as owned one-half by George and one-half by Anthony. In determining their net worth at the end of 1947 and 1948, the respondent treated the note and mortgage, given by Wolfe as part of the purchase price, as owned one-half by George and one-half by Anthony. In determining the net worth of the joint pool at the end of 1949, the respondent treated the note and mortgage, given by Wolfe during that year, as an asset of the pool. Opinion The petitioners contend that the respondent erred in treating Broadway Recreation at the end of 1945 and 1946 and Wolfe's indebtedness for the unpaid portion of the purchase price at the end of 1947 and 1948 as assets owned one-half *105 by George and one-half by Anthony instead of as assets belonging to the joint pool at the end of the respective years. At the hearing in these proceedings George and Anthony testified that Broadway Recreation was acquired in 1945 and was owned by them and Joseph. Anthony testified that when the property was sold to Wolfe in 1947, an amount of $21,000, received as part of the purchase price, was deposited in the bank account of the 333 Bar; that thereafter, until the loan was made to Wolfe in 1949, Wolfe made payments of about $11,500 on the unpaid purchase price and that such payments were deposited in an account that he (Anthony) had at the Cleveland Trust Company which was owned one-half by him and one-half by George. Richar A. Ashmus, the revenue agent who investigated the tax liability of the petitioners for the years here involved, testified that during the course of his investigation Anthony informed him that Broadway Recreation and the note and mortgage given by Wolfe for the unpaid portion of the purchase price were owned equally by him and George. If Joseph, George and Anthony were the owners of Broadway Recreation and the note and mortgage given by Wolfe for the unpaid *106 portion of the purchase price, as the petitioners now urge, then some explanation is necessary to reconcile that position with the fact that the loss from the Broadway Recreation in 1945, the income from it in 1946, and the gain from the sale of it in 1947 were reported in equal amounts by George and Anthony in their returns for the respective years and in their returns for 1947 George and Anthony each stated that he owned one-half of Broadway Recreation. However, no explanation is offered. Nor is any explanation offered as to why if Joseph owned an interest in it he failed to report some portion of said loss, income and gain. Furthermore, no explanation is given as to why the payments by Wolfe on his purchase money note and mortgage were deposited in a bank account owned one-half by George and one-half by Anthony. Since petitioners do not attempt to reconcile the inconsistencies and contradictions here presented, and since we are unable to, we can not find that respondent has erred. Consequently, the contention of the petitioners is denied. Issue 4. Ownership of a three-fourths interest in 333 Georgia Avenue Findings of Fact In determining the net worth of the joint pool at the *107 end of 1947, the respondent included as an asset thereof a three-fourths interest in a property designated 333 Georgia Avenue. Said interest was included at the amount of $7,125, representing three-fourths of $9,500, the fair market value determined by respondent for the property. Opinion In their petitions, the petitioners allege that the respondent erred in failing to include a three-fourths interest in the 333 Georgia Avenue property as an asset in the joint pool and that he further erred in including as a liability of the pool a first mortgage of $9,500 on the property. The record shows that a three-fourths interest was included at $7,125 in the asets of the joint pool, but there is no showing that any mortgage thereon was included as a liability of the pool. The petitioners offered no evidence in support of their allegations and have made no argument with respect thereto on brief. Accordingly, we assume they have abandoned the issue. The respondent's action is sustained. Issue 5. Ownership of mortgage indebtedness owing by Willard Zimmerman Findings of Fact In determining the net worth of Joseph at the end of the years 1946 through 1949, the respondent included as an *108 asset a mortgage indebtedness owing by Willard Zimmerman. Opinion In their petitions, the petitioners allege that the respondent's determination of the net worth of the joint pool at the end of the years 1946 through 1949 was erroneous in that there had not been included as an asset the mortgage indebtedness owing Willard Zimmerman. At the hearing, Anthony conceded that the mortgage indebtedness was an asset owned by Joseph, individually. In view of this and since no argument is made on brief with respect to the matter, the respondent's action is sustained. Issue 6. Living expenses of petitioners Findings of Fact In determining the income of the petitioners for the years in controversy, the respondent has included the following amounts which he determined as living expenses of the petitioners for the indicated years: Joseph
George
Anthony
1946
$4,000
$4,000
1947
4,000
4,000
2,400
1948
3,000
4,000
2,400
1949
4,000
4,000
2,400
Joseph owned an automobile in 1948 and until his death in 1949. The trip during which his death occurred was a five day trip and for it he carried with him at least $500 in cash. So far as shown he made the *109 trip for pleasure. During the years 1946, 1947 and 1948 George was married and had two dependent children. He lived in a house owned by Thomas Properties, Inc., for which he paid $40 a month rent. In 1949 his wife was in a sanitarium for seven weeks at a cost to him of about $400. George did not own an automobile until after Joseph's death. For a part of 1947 Anthony owned a Cadillac automobile. For the greater part of 1949 he owned a 42-foot Owens cruiser. Also for a portion of 1949 he had a Buick automobile. During 1948 and 1949 he made withdrawals of about $200 per month from the 333 Bar for personal expenses. Opinion None of the petitioners made any attempt to reconstruct their living expenses for the years in controversy and as a consequence we are unable, in the light of the few facts shown by the record, to conclude that the respondent's determinations were erroneous. Issue 7. Income taxes paid Findings of Fact In determining the income of the petitioners for the years involved herein, the respondent determined that the following amounts of income taxes were paid by the petitioners during the indicated years and included such amounts in their income for said years: *110 Joseph
George
Anthony
1946
$5,904.46
$ 900.98
1947
3,973.56
2,532.02
$6,784.94
1948
3,879.53
113.40
2,506.62
1949
5,228.46
192.40
1,817.26
Opinion In their petitions the petitioners allege that the amounts used by respondent for income taxes are erroneous and excessive. With respect to the income taxes paid by them for the years here involved, the petitioners put in evidence a certificate from the collector of assessments against, and payments by, them for the taxable years 1946 through 1949. This certificate bears a number of pencil notations, obviously made by someone other that the collector and at some time after the collector issued the certificate. While these notations indicate refunds and credits for some of the years, they in nowise indicate in what year or years or under what circumstances such credits were made or such refunds were received. However, so far as shown they were not allowed during the year of the payment or payments on which they were based. The respondent also put in evidence a certificate from the collector which shows certain payments made by Joseph, George and Anthony in 1946 with respect to their income taxes *111 for 1945. An examination of the two certificates discloses that during the years involved herein the petitioners paid the amounts determined by respondent as set out in our findings on this issue. Since the evidence shows that the petitioners paid the amounts as determined by respondent, their contention that such amounts were excessive or erroneous is not sustained. At the hearing and on brief the petitioners have taken the position that the income taxes paid by them were paid from their personal withdrawals of cash from the joint pool and that it was error for the respondent to treat such amounts as income of the petitioners for the respective years instead of treating them as assets of the pool at the end of the respective years for the purpose of determining the increase in net worth of the pool for said years. In determining net worth as of a given date, only assets owned on that date are properly to be included in the assets. Assets theretofore acquired but no longer owned are not included. Clearly cash withdrawn by petitioners from the joint pool during the years involved here and used by them for the payment of their income taxes was not an asset of the pool at the end *112 of the years withdrawn. Nor was it an asset of the petitioners at the end of the years in which the taxes were paid. However, since the cash, after its withdrawal from the joint pool, was no longer a jointly owned asset but an asset of the individual petitioners and since thereafter during the year they individually used it to discharge their respective liabilities for income taxes, it was an item properly to be considered in determining their income for the year of withdrawal. In connection with their foregoing contention as to the treatment to be accorded money withdrawn from the joint pool for the payment of their income taxes, the petitioners make a somewhat similar contention as to the money used by Anthony in the purchase of the Owens cruiser. Taking the position that the $12,000 used by him in the purchase of the cruiser was taken from the cash of the joint pool and charged to his share or interest in the pool, the petitioners urge that that amount should be treated as an asset of the joint pool at the end of 1949 instead of the cruiser being included at $12,000 in the assets of Anthony at the end of 1949 as respondent has done. So far as the record shows the cruiser was purchased *113 by Anthony as his own and for his own use and not as an asset of the joint pool and for its use. When the $12,000 was withdrawn from the joint pool, it was no longer an asset of the pool but an asset of Anthony, individually. The fact that he paid it for another asset, the cruiser, in nowise made the money or the cruiser an asset of the joint pool. Since Anthony owned the cruiser at the end of 1949, the respondent properly included it among his assets at that time. In view of what has been said above, the contentions of the petitioners must be denied. Issues 8 and 9. Deductions and medical expenses Findings of Fact In his income tax return for 1947, Joseph took deductions totaling $1,300.10 for contributions, taxes (sales and personal property), and miscellaneous. In his return for 1948, he took deductions totaling $2,056.93 for contributions, taxes (sales and personal property), allowable medical and dental expenses, and miscellaneous. In determining Joseph's income for the years 1947 and 1948, the respondent included the amounts of $1,300.10 and $2,056.93, respectively, as income. In his return for 1948, Joseph reported medical expenses for the year totaling $1,232.13. *114 Of that amount, $291.57 was shown as allowable and deduction was taken therefor. The remainder of the $1,232.13, or $941.06, was reported as not allowable. In determining Joseph's income for 1948, the respondent included the $941.06 as income for that year. Opinion It is alleged in the petition for the estate of Joseph that the amounts used by the respondent for the deductions taken and the unallowable portion of the medical expenses are erroneous and excessive. Apparently the respondent has accepted as true the statements made by Joseph in the returns that the amounts were expended by him in the respective years for the indicated purposes. On brief the petitioners state that no controversy exists as to the amount of the medical bills. In view of this statement and since the petitioners have not submitted any evidence showing that the other deductions here involved were different from what was reported on the returns, we can find no basis for concluding that the amounts used by respondent were erroneous or excessive. The respondent is sustained. Issue 10. Extraordinary expenses Findings of Fact In determining the income of Joseph for his taxable period in 1949, the respondent *115 has included as income an amount of $5,000 on account of extraordinary expenses, and which is referred to in the deficiency notice as "Money taken on trip." That amount represented cash withdrawn by Joseph from the 33 Bar shortly before the trip during which he died. Opinion In the petition for the estate of Joseph, it is alleged that the amount included by the respondent is excessive by at least $4,500. Anthony testified to knowing that Joseph took $500 with him on the trip during which he died. George testified to seeing Joseph have $500 at the time he took the boat to go on the trip and conceded that Joseph might have had other money which he did not see. Richard A. Ashmus, the revenue agent who investigated the tax liability of the petitioners for the years involved herein, testified that during the course of his examination of the books and records kept with respect to the 333 Bar he found an undated entry in the third quarter of 1949 showing a withdrawal by Joseph of $5,000 in cash from the Bar; that upon asking an employee of Davidson Audit Company, which kept the books for the Bar from data supplied by Joseph, about the entry, he was advised that the $5,000 was money which *116 Joseph had withdrawn shortly before his trip; and that he (Ashmus) was unable to verify the disposition that was made of that money. The petitioners put in evidence a "Financial Balance Sheet" of the 333 Bar as of the last day of each quarter of 1949, namely, March 31, 1949, June 30, 1949, September 30, 1949, and December 31, 1949. An examination of the balance sheets as of June 30, 1949, and of September 30, 1949, discloses that Joseph's drawings from the Bar between the two dates amounted to $13,750. From the evidence of record bearing on the question, we are of the opinion that the $5,000 in controversy was withdrawn from the Bar by Joseph sometime between June 30, 1949, and his death on September 17, 1949. Since there is nothing in the record to indicate that in determining Joseph's net worth as of the date of his death the respondent has included the $5,000 as an asset of any kind, we sustain the respondent's action in including the amount in income. Issue 11. Dividends from Thomas Properties, Inc. Findings of Fact On an undisclosed date in 1947, Thomas Properties, Inc., distributed to its four stockholders, three of whom were petitioners, as a dividend in kind a parcel *117 of real estate designated 333 Georgia Avenue. Early in 1948 the property was sold for $9,500. In reporting in their 1948 returns the gain from the sale of their one-fourth interests in the property, the petitioners reported that the "cost" of the property was $1,500 and the selling price $9,500. Whether, or in what amount, the petitioners reported income for 1947 on account of the distribution of the property as a dividend is not disclosed. The respondent determined that the one-four interests of the petitioners in the property had a fair market value of $2,375 at the time of distribution. Opinion The petitions of each of the petitioners contain the following allegation: That a purported dividend income in 1947 of $2,375.00 received from Thomas Properties, Inc. is inaccurate in that all dividends of said petitioner [said decedent in the petition of the estate of Joseph] received in 1947 were fully and completely reported and that the amount of so-called fair value or true value of property used is entirely excessive and should be in the amount as indicated on taxpayer's return. In his answers, the respondent denied the allegations. The petitioners have made the foregoing *118 allegations as separate and distinct from those considered and disposed of in "Issue 4", supra, which also involved the 333 Georgia Avenue property. By their allegations here involved the petitioners are contesting the respondent's valuation of their interests when distributed. However, they have offered no evidence as to what the value of the interests were at that time and have made no argument with respect thereto on brief. Since the interests were distributed in 1947, and in the early part of 1948 the petitioners appear to have sold them for $2,375 each, no error is apparent in the respondent's determination that such amount was the value thereof at the time of distribution. Accordingly, the respondent's valuation is sustained. Issue 12. Statute of limitations Findings of Fact Joseph's income tax return for 1946 was filed on January 13, 1947. The notice of deficiency in tax for that year was mailed on February 8, 1951. In his return for 1946, Joseph reported a gross income of $17,175.91. The gross income determined by the respondent for that year was $29,200.97. Opinion At the hearing, counsel for the petitioners took the position that the assessment of the deficiencies *119 determined for 1946 against George and the estate of Joseph is barred by the statute of limitations. The respondent contends that no issue of the running of the statute of limitations has been raised by he pleadings of either George or the estate of Joseph. In neither the original nor the amended petitions filed for the estate of Joseph was any error assigned with respect to the timeliness of the respondent's determination of the deficiency for 1946. However, in the allegations of fact relied on as a basis for the proceeding, it was alleged that assessment of tax for 1946 was barred by the statute of limitations. This allegation was denied by respondent. The issue of the running of the statute of limitations was hereby raised. No assignment of error or allegation of fact as to the timeliness of the respondent's determination of the deficiency for 1946 was made in George's petition relating to that year. He who seeks its benefit, must plead the running of the statute of limitations and prove the facts to support it. United Business Corporation of America, 19 B.T.A. 809. Since George's petition contained no assignment of error or allegation of fact as to the running of *120 the statute of limitations, it is evident that he has not plead the matter of limitations. Therefore, no further consideration will be given to the question so far as it relates to his tax. Relying on the provisions of section 275(c) of the Internal Revenue Code, [1] the respondent contends that since Joseph omitted from his gross income for 1946 an amount in excess of 25 per cent of the amount stated in his return, the period of limitations for assessment of the deficiency is five years from the time the return was filed. Since Joseph omitted from his gross income an amount in excess of 25 per cent of the amount stated in the return and since the return was filed on January 13, 1947, and the deficiency notice was mailed on February 8, 1951, the period of limitations on assessment of the deficiency for 1946 has not expired. *121 Issue 13. Benefit of split income Opinion In his petition relating to the deficiency for 1948, George assigned as error the action of the respondent in not allowing the benefit of "split income" in the computation of his tax liability for that year. He alleged that he was married during the entire year and that a joint return was filed. The respondent denied the error assigned and the allegation of facts. No mention is made of this issue by petitioners on brief. Apparently the benefit sought by George under this issue is that provided in section 12 (d) of the Code. [2] The benefit there provided for is allowable where a joint return is filed by husband and wife. The return filed by George for that year was put in evidence. Although it is stated therein that a separate return for that year was not being filed by his wife, the name appearing on the return is only that of George and it is signed only by him. With no more information than we have, we are not able to conclude that the return was a joint return of George and his wife or was intended by them to be such a return. In view of the state of the record and since the petitioners have not mentioned the matter on brief, we conclude *122 that they have abandoned the issue. Accordingly, we hold for respondent. Decisions will be entered for the respondent. Footnotes
1. SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION. Except as provided in section 276 - (a) General Rule. - The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period. * * *
(c) Omission from Gross Income. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed.↩
2. SEC. 12. SURTAX ON INDIVIDUALS. * * *
(d) Tax in Case of Joint Return. - In the case of a joint return of husband and wife under section 51(b), the combined normal tax and surtax under section 11 and subsection (b) of this section shall be twice the combined normal tax and surtax that would be determined if the net income and the applicable credits against net income provided by section 25 were reduced by one-half.↩